**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| RONALD HARDING,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW LINDAHL, Police Sergeant of the City of Rockland and BRUCE BOUCHER, Chief of Police of the City of Rockland.<br><br>Defendants. | ) | Docket No. 2:15-cv-396-NT |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before me is the Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 30). For the reasons stated below, the motion is **GRANTED**.

## FACTUAL BACKGROUND[1]

On the night of August 2, 2012, Plaintiff Ronald Harding and his mother Pamela Harding[2] were victims in a violent altercation in a McDonald's parking lot in Rockland, Maine. *See* Def.'s Statement of Material Facts ¶¶ 1-2 ("**DSF**") (ECF No. 37). While the Hardings were waiting to place their order in the drive-through lane,

---

1 At the summary judgment stage, I must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in his favor. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). In this case, the inferences that could be reasonably drawn in the Plaintiff's favor are limited by the video evidence captured on the Defendant's police cruiser. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

2 Pamela Harding is no longer a party to this action. *See* Order of Dismissal (ECF No. 21).

two men in a truck ahead of them became agitated and aggressive.[3] *See* Transcript of Dash Camera Recording 6 ("**Transcript**") (ECF No. 29-3). Words were exchanged, the situation quickly escalated, and one of the men in the truck began hitting the Hardings' vehicle with a broom handle. Transcript 6. After Ronald Harding got out of his vehicle and yelled at the man to stop, Harding was attacked. Transcript 6-7. The other man in the truck eventually joined the fray, and Harding was knocked to the ground and beaten. Transcript 6-7.

Defendant Matthew Lindahl, a sergeant in the Rockland Police Department, was dispatched to the scene after a McDonald's employee called 911 to request emergency assistance. DSF ¶ 2. The employee reported that three men were fighting and that one of them was armed with a broom handle. DSF ¶ 2; Lindahl Aff. ¶ 3 (ECF No. 29-1). Deploying flashing blue lights and siren, Sergeant Lindahl arrived at McDonald's at around the same time Deputy Police Chief Wally Tower arrived in a separate vehicle. DSF ¶ 5. When he arrived, Sergeant Lindahl observed Harding, who was standing with a woman facing him, with her hands on him restraining him protectively, as he yelled at another male standing approximately 25 feet away.

[3] The Plaintiff filed an opposition to the Defendant's supporting statement of material facts, but did not file additional facts. *See* L.R. 56(c). The Plaintiff's opposing memorandum includes a section titled "Facts" that contains a mix of factual information and argument without any citation to the record. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. 2-4 ("**Pl.'s Opp'n**") (ECF No. 33). This "Facts" section does not comply with the local rules. L.R. 56(f) ("An assertion of fact . . . shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material . . . ."). I rely on the video evidence and the corresponding transcript to provide the necessary background narrative. The parties do not dispute the authenticity of this evidence. *See* Def.'s Statement of Material Facts ¶ 4 ("**DSF**") (ECF No. 37).

DSF ¶ 6.[4] Harding was the only individual that Sergeant Lindahl observed who was agitated and aggressive. DSF ¶ 6.

After Sergeant Lindahl exited his vehicle, he approached Harding and the woman who turned out to be Harding's mother. DSF ¶ 9. Chief Deputy Tower meanwhile "directed his attention to the man at whom [Harding] had been shouting." DSF ¶ 9. Harding was agitated; he could not stop talking and was "yelling loudly at the other two men that had been involved in [the] altercation with him prior to the arrival of the police." DSF ¶ 7. The following recitation was captured on video by the dash camera on Sergeant Lindahl's police cruiser:

> **Sergeant Lindahl**: (exiting car) Hi, what's going on?
> **Ronald Harding**: He hit me with a fucking broom.
> **Pamela Harding**: (That?) man . . .
> **Sergeant Lindahl**: Okay. C'mon over here for me.
> **Ronald Harding**: He hit me in the fucking gut.
> **Pamela Harding**: (That?) man . . .
> **Sergeant Lindahl**:[5] Okay, come over here for me.
> **Ronald Harding**: He put me on the ground, he had me in a fucking—
> **Pamela Harding**: (That?) man . . .
> **Sergeant Lindahl**: Okay. Stop. (unintelligible)
> **Ronald Harding**: Please go home.
> **Sergeant Lindahl**: Stop! Put your hands behind your back.

Transcript 1-2. After yelling stop, Sergeant Lindahl grabbed Harding by his right arm and steered him toward the front of the police cruiser to handcuff him. Dash Camera Recording 1:15-1:20 ("**Dash Cam. Rec.**") (ECF No. 29-2). While Sergeant Lindahl

---

[4] The Plaintiff's hearsay objection to this statement of material fact is overruled. Sergeant Lindahl's observations are not hearsay. Because the Plaintiff failed to otherwise deny or qualify the statement of material fact, the fact is deemed admitted. L.R. 56(f). In any event, the video confirms Sergeant Lindahl's account.

[5] The transcript mistakenly indicates that Ronald Harding said this. The video recording establishes that it was Sergeant Lindahl. *See* Dash Camera Recording 1:13-1:14 (ECF No. 29-2).

was trying to handcuff Harding, his mother yelled "Ronnie!" and approached Sergeant Lindahl from behind. Sergeant Lindahl told her to let go of him twice while pushing her away. Dash Cam. Rec. 1:18-1:23. At the time Sergeant Lindahl put Harding in handcuffs, Sergeant Lindahl had been at the scene for "[a]pproximately one and a half minutes." DSF ¶ 11. While Sergeant Lindahl was applying the handcuffs, the following exchange occurred:

> **Sergeant Lindahl**: You're being detained until we find out what's going on.
> **Ronald Harding**: Go right ahead.
> **Sergeant Lindahl**: Okay? You're not under arrest.

Transcript 2.

Thereafter, the Hardings continued to talk over one another while Sergeant Lindahl yelled at them multiple times to stop. Then, two additional officers in plainclothes arrived on the scene and escorted Pamela Harding away from her son. DSF ¶ 14; Pl.'s Response to Def.'s Statement of Facts ¶14 ("**PRDSF**") (ECF No. 34). The conversation between Ronald Harding and Sergeant Lindahl continued:

> **Ronald Harding**: Can you stop yelling at me, please?
> **Sergeant Lindahl**: Well, you gotta stop talking at the same time. You gotta do what I tell you to do, do you understand?
> **Ronald Harding**: (unintelligible) I understand what you're saying, but my stomach hurts. I have an ulcer.
> **Sergeant Lindahl**: Okay. Okay. Do you need an ambulance for your injuries here tonight?
> **Ronald Harding**: I don't know just yet, to be honest with you.

Transcript 6. Sergeant Lindahl then asked Harding about how the altercation started, and Harding explained his version of the story. Dash Cam. Rec. 3:19-5:56. After hearing Harding's version, Sergeant Lindahl again asked if Harding needed an ambulance and inspected Harding's stomach and arm for injuries with another

officer. Dash Cam. Rec. 5:56-6:22. After further discussion with Harding "and after the police on the scene conferred with the other combatants and with each other about the particulars of the altercation that had taken place, [Harding] was released from handcuffs." DSF ¶ 19. He was in handcuffs for approximately 16 minutes. PRDSF ¶ 19. The entire encounter took place in the parking lot as multiple cars passed through the drive-through lane. Dash Cam. Rec. 1:05-17:12.

## PROCEDURAL HISTORY

In September of 2015, Harding filed a seven-count Complaint against Sergeant Lindahl and Bruce Boucher, the acting Chief of Police of the City of Rockland. Compl. (ECF No. 1). The parties jointly stipulated to the dismissal of several claims in August of 2016, including dismissal of all claims against Boucher. *See* Stipulation of Dismissal 1 (ECF No. 26). Sergeant Lindahl moved for summary judgment on the remaining claims. Def.'s Mot. for Summ. J. (ECF No. 30).

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 223 (1st Cir. 2013) (citation omitted). "A fact is material if it has potential to determine the outcome of the litigation." *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). In deciding a motion for summary judgment, the Court construes the record in the light most favorable to the nonmovant and draws all reasonable

inferences in its favor. *Jakobiec*, 711 F.3d at 223. However, "the inferences that can reasonably be drawn are limited by the existence of video evidence." *Mitchell v. Miller*, 790 F.3d 73, 76 (1st Cir. 2015). Thus, the Court must "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

Summary judgment should be denied if the nonmoving party's evidence is strong enough "to support a verdict in her favor." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). But "[s]ummary judgment for the defendant[ ] is appropriate when the evidence is so one-sided that no reasonable person could find in favor of the plaintiff." *Kosereis v. Rhode Island*, 331 F.3d 207, 211 (1st Cir. 2003).

## DISCUSSION

### I. Count II: The Plaintiff's § 1983 False Arrest Claim

#### A. The Governing Law

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The Amendment "does not prohibit all searches and seizures but, rather, only those that are unreasonable." *United States v. Pontoo*, 666 F.3d 30, 27 (1st Cir. 2011).

"A detention at the hands of a police officer constitutes a seizure of the detainee's person and, thus, must be adequately justified under the Fourth Amendment." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009). There are two types of seizures: "arrests (whether actual or de facto) and temporary detentions (such as investigatory stops)." *Id*. The justification required depends on the type of seizure at

issue. For a valid investigative stop, otherwise known as a *Terry* stop, an officer needs "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Schubert v. City of Springfield*, 589 F.3d 496, 501 (1st Cir. 2009). A valid arrest requires a higher showing of probable cause to believe that a suspect has committed or is committing a crime.

In considering whether a *Terry* stop was valid, courts examine, "first, 'whether the officer's action was justified at its inception,' and second, 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "To be justified at its inception, a *Terry* stop must be accompanied by reasonable suspicion." *Pontoo*, 666 F.3d at 26. "Reasonable suspicion requires there be both a particularized and an objective basis for suspecting the individual stopped of criminal activity." *United States v. Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013). "[T]he only pertinent 'facts' are the information available to the officer." *Bolton v. Taylor*, 367 F.3d 5, 7 (1st Cir. 2004). When these facts are in dispute, "the fact-finder must resolve the dispute." *Holder v. Town Of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009). But "when the underlying facts claimed to support [reasonable suspicion] are not in dispute, whether those 'raw facts' constitute [reasonable suspicion] is an issue of law." *Id.*

Regarding the second step, the scope of the stop must be limited "because a *Terry* stop allows an individual to be seized on less than probable cause." *Pontoo*, 666 F.3d at 30. "If police actions associated with a *Terry* stop are too intrusive in nature or too long in duration, those limits are exceeded." *Id.*

The dividing line between a *Terry* stop and a de facto arrest is not always clear. *See Florida v. Royer*, 460 U.S. 491, 506 (1983). Generally, "a detention transforms into a de facto arrest when a reasonable person, in the suspect's position, would feel the degree of restraint normally associated with formal arrest." *United States v. Candelario-Santana*, 834 F.3d 8, 18 (1st Cir. 2016). This analysis is based on the totality of the circumstances, including "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect." *Id.* (citation omitted). Though relevant, the "temporary use of coercive measures, such as handcuffs, and even drawing a weapon are not dispositive." *Id.* With this framework in mind, I turn to the facts of the case at hand.

### B. Application of Governing Law to the Facts of the Case

#### 1. Reasonable Suspicion

The facts known to Sergeant Lindahl justified a *Terry* stop. At the inception of the encounter with Harding, Sergeant Lindahl had been dispatched to McDonald's "in response to a 911 call for emergency assistance from a McDonald's employee who reported that three males were fighting in the drive-through lane at the restaurant." DSF ¶ 2. When Sergeant Lindahl arrived at the restaurant, he observed Harding being restrained by a woman "as he yelled at another male standing about 25 feet away." DSF ¶ 6. These facts, coupled with Harding's agitated state, gave rise to a reasonable suspicion that Harding had committed a crime. *See* 17-A M.R.S.A. § 207 (assault); *see also* 17-A M.R.S.A. § 501-A (disorderly conduct). Accordingly, that suspicion justified a temporary detention so that Sergeant Lindahl could investigate

whether those crimes had in fact been committed. The undisputed raw facts known to Sergeant Lindahl constitute reasonable suspicion sufficient to support a *Terry* stop.

**2. Scope of Stop**

Turning to scope, the totality of the circumstances establish that Harding's detention was reasonable and did not amount to a de facto arrest. Several factors demonstrate that a reasonable person would not have believed he was under arrest under these circumstances. First, the information conveyed to Harding suggested that the encounter was a *Terry* stop. Sergeant Lindahl told Harding that he was being detained until the police could find out what was going on, and Harding acknowledged this by responding "Go right ahead." DSF ¶¶ 11-12. Lindahl then explicitly told Harding that he was not under arrest. DSF ¶ 13. Telling someone that they are not under arrest and explaining the reasons for their detention "has the potential to reduce the stress of such a detention and, thus, minimize its intrusiveness." *United States v. McCarthy*, 77 F.3d 522, 532 (1st Cir. 1996).

Second, Sergeant Lindahl did not confine Harding in the backseat of his cruiser or transport him to the police station or a separate detention area to be interrogated. *Cf. Morelli*, 552 F.3d at 21 (jury could find de facto arrest where plaintiff was moved from public hallway to private room where she was interrogated by several police officers). Nor did he read Harding his *Miranda* rights. Instead, the entire encounter took place in a busy public area as cars continuously passed through the McDonald's drive-through. *See Flowers v. Fiore*, 359 F.3d 24, 31 (1st Cir. 2004) (holding that a de facto arrest did not occur where, *inter alia*, police did not relocate plaintiff or read

him his *Miranda* rights and "[t]he entire episode occurred in neutral surroundings—on a public street").

Third, Harding's detention was brief. "Although not dispositive alone, the relative brevity of the detainment supports the conclusion that [a] seizure did not exceed the boundaries of a permissible *Terry* stop." *United States v. Mouscardy*, 722 F.3d 68, 74 (1st Cir. 2013). Here, Harding was in handcuffs for approximately 16 minutes. PRDSF ¶ 19. This is far shorter than other *Terry* stops that have been held lawful. *See, e.g.*, *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999) (55 minute detention not a de facto arrest); *see also Mouscardy*, 722 F.3d at 74 (collecting cases).

And fourth, the stop was not unreasonably prolonged. In analyzing the duration of a *Terry* stop, courts inquire into "whether the length of [the] detention was reasonable, considering 'the law enforcement purposes to be served by the stop . . . and whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *United States v. Acosta-Colon*, 157 F.3d 9, 20 (1st Cir. 1998) (quoting *McCarthy*, 77 F.3d at 530). While Harding was detained, Sergeant Lindahl and the other officers on the scene spoke "with the other combatants and with each other about the particulars of the altercation" to sort out what had happened. DSF ¶ 19. Once their investigation was completed, the handcuffs were taken off of Harding, and his freedom of movement was not further restricted. Under the circumstances, the duration of the investigatory detention was reasonable.

In arguing to the contrary, Harding focuses entirely on the fact that he was handcuffed and points out that "handcuffs are restraints on freedom of movement normally associated with arrest."[6] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 8 ("**Pl.'s Opp'n**") (ECF No. 33) (quoting *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989)). But the "use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest" because "[p]olice officers engaged in an otherwise lawful stop must be permitted to take measures—including the use of handcuffs—they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." *Acosta-Colon*, 157 F.3d at 18.

Here, the use of handcuffs can be reconciled with the limited nature of a *Terry* stop. Once Sergeant Lindahl "had reasonable suspicion justifying a stop, he was permitted to take actions to ensure his own safety." *Schubert*, 589 F.3d at 503. The decision to use handcuffs was reasonable for safety purposes given the frantic situation he encountered when he responded to the scene. As Harding admits, at the time the police arrived, he was agitated, yelling loudly at the other combatants, and unsure "whether or not he was going to get back into fighting with the other two men." DSF ¶¶ 7-8. Further, Harding was the only individual Sergeant Lindahl observed who was agitated and aggressive. DSF ¶ 6. And Harding was being restrained protectively by his mother while yelling at another man when Sergeant

---

[6] The number of officers on the scene is also pertinent, and the dash camera video depicts five officers in the parking lot. But "[m]ere numbers do not automatically convert a lawful *Terry* stop into something more forbidding." *United States v. Zapata*, 18 F.3d 971, 976 (1st Cir. 1994). Here, the officers were each involved in different tasks and they were not surrounding Harding in any coercive manner.

Lindahl reached the scene. DSF ¶ 6. Under these circumstances, it was reasonable for Sergeant Lindahl to conclude that handcuffs were necessary to protect himself and others and bring order to the chaos while he conducted his preliminary investigation. *See Parks v. Tatarinowicz*, No. 04-CV-445-PB, 2005 WL 2989673, at *5 (D.N.H. Nov. 4, 2005) (concluding that it was reasonable for police responding to a 911 call to handcuff a suspect who was acting aggressively). Thus, the use of handcuffs did not transform the investigatory stop into a de facto arrest. Given the video evidence, a reasonable jury could not conclude that Sergeant Lindahl surpassed the permissible scope of a *Terry* stop.

Alternatively, even assuming *arguendo* that the detention did exceed the bounds of a permissible *Terry* stop, Sergeant Lindahl would still be entitled to qualified immunity. "Qualified immunity is a judicial gloss designed to allow public officials to perform discretionary tasks without the constant threat of legal liability. As the Supreme Court has explained, the doctrine is intended to protect 'all but the plainly incompetent [and] those who knowingly violate the law.' " *Morelli*, 552 F.3d at 18 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal citation omitted). Simply put, any unlawfulness of Sergeant Lindahl's conduct would not have been apparent to an objectively reasonable officer standing in his shoes. *See, e.g., Machado v. Weare Police Dep't,* 494 F. App'x 102, 106 (1st Cir. 2012) (per curiam) ("[E]ven if we assume *arguendo* that the handcuffs and the detention in the cruiser exceeded the limits of a permissible *Terry* stop, this is a sufficiently debatable case that an objectively reasonable officer could have believed that his conduct was not violating

[the plaintiff's] constitutional rights, which is enough to create qualified immunity." (internal citations omitted)); *Ratcliff v. City of Red Lodge, Dep't of Police Mont.*, 650 F. App'x 484, 486 (9th Cir. 2016) (reversing district court's denial of qualified immunity where an officer responding to a report of a physical altercation detained and handcuffed the plaintiff for 25 minutes while conducting his investigation); *Bordeaux v. Lynch*, 958 F. Supp. 77, 87 (N.D.N.Y. 1997) (granting officers qualified immunity because "reasonable officers could disagree on whether the *Terry* stop escalated into a de facto arrest without probable cause"). Thus, Sergeant Lindahl's motion for summary judgment on this claim is granted.

## II. Counts I & II: The Plaintiff's 42 U.S.C. § 1983 Substantive Due Process Claim

The framework for analyzing excessive force claims under 42 U.S.C. § 1983 "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Next, the validity of the claim must "be judged by reference to the specific constitutional standard which governs that right." *Id.* If, like here, the "excessive force claim arises in the context of an arrest or investigatory stop . . . , it is most properly characterized as one invoking the protections of the Fourth Amendment" from unreasonable seizures. *Id*. Thus, under *Graham*, Harding cannot bring a substantive due process claim because the appropriate constitutional standard is the "Fourth Amendment and its 'reasonableness' standard, rather than . . . a 'substantive due process' approach." *Graham*, 490 U.S. at 395.

Undeterred by *Graham*, Harding notes that "[c]laims of excessive force by a police officer arising outside the context of a seizure, and thus outside the Fourth Amendment, are analyzed under substantive due process principles." Pl.'s Opp'n 9 (citing *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001)). That means, according to Harding, that "[i]f there was no arrest than the Defendant's actions can still implicate a . . . substantive due process claim." Pl.'s Opp'n 9. But this argument assumes that the Fourth Amendment is limited to arrests, which, of course, is not the case. *See* U.S. Const. amend. IV ( protecting "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."). Because the conduct at issue here occurred in the context of a seizure, this case must be analyzed under the Fourth Amendment. *See, e.g., Estate of Bennett v. Wainwright*, 548 F.3d 155, 163 (1st Cir. 2008) ("[S]ubstantive due process claim premised on the deprivation of [a shooting victim's] life interest . . . fails because this is in essence an excessive force claim that should be—and is—brought under the Fourth Amendment.").

## III. Counts I & III: The Plaintiff's 42 U.S.C. § 1983 Excessive Force Claim

### A. Overview of the Law

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth

Amendment." *Id.* (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

To establish an excessive force violation, a plaintiff "must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation." *Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341, 352 (1st Cir. 1995). The inquiry considers "the totality of the circumstances, taking the 'perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight.' " *Mitchell*, 790 F.3d at 77 (quoting *Plumhoff*, 134 S. Ct. at 2020). In considering whether the force employed was reasonable, courts "balance the individual's interest against the government's," while "weighing three non-exclusive factors: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.' " *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (quoting *Graham*, 490 U.S. at 396).

**B. Application of Governing Law to the Facts of the Case**

To begin, I note that Harding has not attempted to defend his Fourth Amendment excessive force claim in his response to Sergeant Lindahl's motion for summary judgment. In the introduction section of his memorandum, he posits that his "handcuffing . . . while the actual perpetrators were being questioned free of

restraints . . . is evidence of both excessive force and an equal protection violation."[7] Pl.'s Opp'n 4. But the remainder of his opposition is devoid of any argument regarding a Fourth Amendment excessive force claim.

In any event, Harding's excessive force claim fails. The factors used to assess the reasonableness of the force weigh in Sergeant Lindahl's favor. Sergeant Lindahl was dispatched to McDonald's to provide emergency assistance based on an employee's report that three men were fighting and one of the men was armed with a broom handle. The crime Sergeant Lindahl was investigating involved violence in a crowded public place. Harding posed a potential safety risk. He was agitated and being restrained by his mother. Although Harding did not resist handcuffing, he was upset, not listening to Sergeant Lindahl, and having difficulty calming himself. On balance, these facts justify a moderate degree of force. The level of force employed by Sergeant Lindahl was minimal. Under these circumstances, grabbing Harding by the arm and placing him in handcuffs was objectively reasonable.[8] *See, e.g., Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 327 (1st Cir. 2015) (finding no excessive force under circumstances where "only a minimal level of force" would be reasonable and the officer shoved the plaintiff "face-first against a wall and proceed[ed] to

---

[7] Harding previously stipulated to the dismissal of his Equal Protection claim. Stipulation of Dismissal 1 (ECF No. 26) (stipulating to the dismissal of "[a]ny and all claims for a violation of [Harding's] Constitutional right to equal protection").

[8] In addition, I note that Harding has not alleged that the handcuffs were unreasonably tight or uncomfortable, and has not directed me to any evidence suggesting that he was injured by Sergeant Lindahl. *See Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002) (while not dispositive, courts are also free to consider the severity of the injury at issue in analyzing excessive force claims); *see also Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991) (finding that "minor physical injuries simply are insufficient to support an inference" of excessive force).

handcuff her left wrist"); *Flowers*, 359 F.3d at 34 (holding that officers who displayed firearms and handcuffed a non-resisting motorist that they suspected was armed did not use excessive force); *Calvi v. Knox Cty.*, 470 F.3d 422, 428 (1st Cir. 2006) (finding no excessive force where officer handcuffed arrestee for 15 minutes despite existence of hand deformity).

Because I do not believe that any properly instructed jury could reasonably conclude that Sergeant Lindahl used excessive force, I grant the Defendant's motion on this claim.

## IV. Remaining State Law Claims

Having granted summary judgment on all of Harding's federal claims,[9] I must decide whether to exercise supplemental jurisdiction over his remaining state law claims, which include claims for assault and battery, violations of the Maine Civil Rights Act, and intentional/negligent infliction of emotional distress. *See Desjardins v. Willard*, 777 F.3d 43, 45 (1st Cir. 2015) ("Where a federal court has dismissed the anchoring federal claims over which it has original jurisdiction, the court 'may decline to exercise supplemental jurisdiction' over the remaining state law claims." (quoting 28 U.S.C. § 1367(c)(3))).

[9] The Stipulation of Dismissal states that the parties' jointly stipulate to the dismissal of "[a]ny and all claims arising under the Eight Amendment." Stipulation of Dismissal 1. The next page, however, states that the remaining claims going forward include allegations "that Officer Lindahl's conduct violated Plaintiff's federal and state Constitutional rights to be free from . . . cruel and unusual punishment." Stipulation of Dismissal 2. I assume that the parties intended to dismiss this claim because neither addressed it in their briefing. But if not, the claim plainly fails because the Eighth Amendment applies only after the state has secured an adjudication of guilt. *Martinez Rivera v. Sanchez Ramos*, 498 F.3d 3, 9 (1st Cir. 2007).

"[D]istrict courts must weigh several factors when deciding whether to exercise jurisdiction over pendent state law claims: assuming jurisdiction might promote 'judicial economy' and 'convenience,' but declining jurisdiction might promote 'comity' or afford the parties a 'surer-footed reading of applicable law' from state courts." *Eves v. Lepage*, No. 16-1492, 2016 WL 6872654, at *9 (1st Cir. Nov. 22, 2016) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). And "[t]he Supreme Court has made pellucid 'that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.' " *Rivera-Diaz v. Humana Ins. of P.R, Inc.*, 748 F.3d 387, 392 (1st Cir. 2014) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Given that all of Harding's federal claims have been eliminated before trial, and considering the factors outlined above, I decline to exercise supplemental jurisdiction over Harding's state law claims.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion for summary judgment (ECF No. 30). The Court declines to exercise supplemental jurisdiction over the Plaintiff's remaining state law claims. Those claims are **DISMISSED WITHOUT PREJUDICE.**

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 12th day of December, 2016.